**FIFTH DIVISION**
**MCFADDEN, C. J.,**
**MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 13, 2020**

# In the Court of Appeals of Georgia

A19A2224. JONES v. THE STATE.

McMillian, Presiding Judge.

After a jury convicted Andrew Montez Jones of three counts each of sodomy and sexual battery, two counts of aggravated sodomy, and one count of battery[1] arising from five separate incidents involving college-aged men and the trial court denied his motion for new trial, Jones appeals. Because we find that the evidence supported these convictions, Jones' assertions of error by the trial court lack merit, and Jones did not receive ineffective assistance of trial counsel, we affirm. However, we vacate the sentences on Jones' convictions for sexual battery and sodomy and remand for resentencing in accordance with this opinion.

---

[1] A separate count of criminal damage to property in the second degree was nol prossed.

Viewed in the light most favorable to the verdict,[2] the evidence showed that on December 15, 2015, O. Y., a freshman at the University of Georgia ("UGA"), went with Jones to a bar in downtown Athens where Jones bought the drinks and pressured him into drinking one last drink. Afterwards, O. Y. began feeling sick and dizzy, and he went to the bathroom and vomited. The two men then went to another bar, and the next thing O. Y. remembered was waking up, naked, in Jones' bed, with Jones on top of him performing oral sex. O. Y. did not consent to Jones' actions. He pushed Jones off and went into the bathroom to clean himself. After O. Y. got dressed, the men argued, and Jones got "really angry" and punched O. Y. in the face, hitting him repeatedly.

As O. Y. tried to leave Jones' apartment, Jones began hitting him again. O. Y. was able to escape and sought help at a downstairs apartment, but Jones told him to get back in the apartment, or "I'm gonna kill you." Afraid for his life, O. Y. went back upstairs, where Jones locked the door and tried to take O. Y.'s clothes off. O. Y. resisted, and when Jones "let his guard down," he "made a run for it." O. Y. then reported Jones' actions to police.

---

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

The morning after the incident, O. Y. underwent an examination by a sexual assault nurse examiner ("SANE"), who took swabs and a urine sample for testing. During the exam, the SANE observed blood around O. Y.'s nose and other evidence that supported O. Y.'s statement that he had been in some sort of fight. Testing by the GBI crime lab later showed that O. Y.'s urine was positive for tramadol, a Schedule IV controlled substance and synthetic opium derivative used to treat pain. A special agent for the Georgia Drugs and Narcotics Agency testified that the consumption of alcohol with tramadol may result in increased sedation, drowsiness, and sleepiness, as well as reduced pain sensation, and at higher doses, this combination could cause an individual to black out.

K. V. testified that he met Jones while playing ultimate frisbee as a student at UGA. On July 13, 2013, K. V. went with Jones, and two other ultimate frisbee teammates to a bar in downtown Athens. K. V. was "goaded" by his friends into having a drink called an "inception bomb," which Jones arranged to be given to K. V. for free. Afterwards, K. V. recalled texting a friend, and the next thing he remembered was waking up naked in Jones' bed with Jones rubbing his penis and performing oral sex. K. V. said he "froze" during this encounter and testified that he had no desire to engage in sexual conduct with Jones. He later felt someone pulling

3

boxer shorts up around him. When K. V. awoke, he was wearing boxer shorts that did not belong to him. He then got up, went downstairs, and asked Jones what had happened. Jones told K. V. that he was intoxicated, had become ill, and vomited on himself, so Jones had washed his clothes.

UGA student C. B. also met Jones while playing ultimate frisbee. On or about November 19, 2013, C. B. ran into Jones at an Athens bar where Jones kept buying him drinks. The two then went to another bar where they continued to drink. C. B. testified that "things got blurry" and he felt "numb" and "limp" after leaving the bar, which had never happened to him before. Jones drove C. B. to his apartment and offered him the bed. Jones then got into bed with C. B., who was "feeling really bad," and he started making sexual advances, while C. B. "[had] to continuously go to the bathroom to vomit." Jones tried to take off C. B.'s clothes and to do things that he "was not wanting . . . or anything like that." When Jones placed his mouth on C. B.'s penis, C. B. tried to push Jones off, but he was unsuccessful because "I couldn't control my body, I couldn't fight back. I could try to put my hands up, that kind of thing, but, um, for the most part everything was just too hard to focus on, um, because I – my mind just wasn't working." When C. B. confronted Jones the next morning, Jones said nothing had happened and that C. B. was wrong if he thought it had. After

4

this incident, C. B. immediately quit the ultimate frisbee team and told his coaches that Jones had "raped" him.[3]

J. H., who was a student at the University of North Georgia-Oconee, became friends with Jones when they worked together at an Athens restaurant. On October 11, 2014, J. H. went to Jones' apartment where he planned to spend the night before attending an early morning work meeting. The two men went to a bar in downtown Athens where Jones claimed he knew the bartender and they could get free drinks. As they left the bar in a cab, J. H. was feeling woozy "like almost, kind of fading in and out kind of feelings." His next memory was waking up with Jones on top of his legs. Although J. H. was aware of what was going on, he felt like he could not move. J. H. faded back out of consciousness, and when he woke again, Jones was holding him down with one hand and touching J. H.'s genitals with his mouth. J. H. did not consent to Jones' actions. When J. H. tried to sit up and tell Jones "no," Jones "forcibly shoved [him] back down . . . and told [him] to stop." When J. H. woke up the next morning, he was wearing a different pair of underwear, and both of his legs were through one opening.

---

[3] C. B., J. H., and W. W. each testified that they did not immediately report the incidents involving Jones to police.

5

On November 7, 2015, UGA student W. W. ran into Jones, whom he had recently met, at a bar in downtown Athens. W. W. and Jones later went to another bar and had a drink called a "Vegas Bomb" or "Bomb." Although W. W. was a "pretty experienced" drinker, the next thing he remembered was waking up at Jones' apartment, but he did not remember how he got there. W. W. recalled throwing up, texting his girlfriend, and walking around outside and then later waking up two times with Jones performing oral sex on him. When he next awoke, Jones was telling him to pull his pants up. W. W. testified that he did not consent to Jones' actions.

W. W. "ran as fast as [he] could," and called his girlfriend to come get him. When she arrived, W. W. told her that he had been "raped." W. W. later submitted to an examination by a SANE, to whom he reported what had happened. The evidence showed that swabbings from W. W.'s penis and scrotum were positive for saliva, which DNA testing matched to Jones. W. W. later texted Jones, who denied there was any sexual contact between them.[4]

1. Contrary to Jones' argument on appeal, we find that the evidence at trial was sufficient to support his convictions beyond a reasonable doubt. "When we consider

---

[4] The prosecution also presented extrinsic acts evidence of two additional incidents, which will be discussed further in Division 5 below.

the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and inquire only whether any rational trier of fact might find beyond a reasonable doubt that the defendant is guilty of the crimes of which he was convicted." *Dorsey v. State*, 303 Ga. 597, 600 (1) (814 SE2d 378) (2018). See also *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." (Citation and punctuation omitted.) *Dorsey*, 303 Ga. at 600 (1).

a. *Sodomy*. Although Jones was charged with five counts of aggravated sodomy, each count involving one of the victims, the jury convicted him of the lesser included offense of sodomy on the charges relating to K. V., C. B., and W. W. See *Melton v. State*, 282 Ga. App. 685, 693 (2) (c) (639 SE2d 411) (2006) (sodomy lesser included offense of aggravated sodomy); OCGA § 16-1-6.

(i) Under Georgia law, "[a] sodomy conviction requires evidence of a nonconsensual, public, or commercial act involving contact between one party's sexual organs and the other's mouth or anus. OCGA § 16-6-2 (a) (1)." *Melton*, 282 Ga. App. at 692-93 (2) (c). See also *Powell v. State*, 270 Ga. 327, 336 (3) (510 SE2d

18) (1998) (holding that consensual, private, non-commercial act of sodomy is constitutionally protected). K. V., C. B., and W. W. each testified that Jones performed at least one nonconsensual act in which his mouth touched the victim's penis, as alleged in the indictment.[5] That testimony and other evidence at trial was sufficient to support Jones' sodomy convictions beyond a reasonable doubt.

(ii) However, the State, to its credit, has brought to this Court's attention that the trial court failed to impose a split sentence on each of the sodomy counts (Counts 1, 2, & 5) in accordance with the version of OCGA § 17-10-6.2 (b) in effect at the time of Jones' sentencing in May 2017.

The trial court sentenced Jones to 20 years on each sodomy conviction to run consecutively to his life sentence, with a 25-year mandatory minimum, on the aggravated sodomy conviction under Count 3.[6] At the time that Jones' sentence was imposed in May 2017, OCGA § 17-10-6.2 (b) provided, in pertinent part, that

---

[5] The aggravated sodomy counts charged Jones with committing a sexual act involving his mouth and the sex organs of each of the victims.

[6] The trial court also imposed a consecutive sentence of life, to serve 25 years, on the second aggravated sodomy conviction under Count 2 and concurrent sentences on the convictions for sexual battery and battery under Counts 4, 6, 8, and 10, resulting in an overall sentence of life, with 70 years confinement.

any person convicted of a sexual offense shall be sentenced to a split sentence which shall include the minimum term of imprisonment specified in the Code section applicable to the offense. No portion of the mandatory minimum sentence imposed shall be suspended, stayed, probated, deferred, or withheld by the sentencing court and such sentence shall include, in addition to the mandatory imprisonment, an additional probated sentence of at least one year.

See Ga. L. 2006, p. 395, § 21. The statute defined the crime of sodomy under OCGA § 16-6-2 as a "sexual offense" subject to this sentencing requirement. Id. See also OCGA § 17-10-6.2 (a) (3) (2019). Our Supreme Court has interpreted this provision as mandating that the trial court impose a split sentence, including at least one year of probation, on each of the sodomy counts. *State v. Riggs*, 301 Ga. 63, 66 (1) (799 SE2d 770) (2017). The Supreme Court further noted that "the trial court may run a split sentence partially consecutive and partially concurrent to another sentence, such that the probationary component of a split sentence may be served concurrently with a period of confinement imposed by the sentence on another count." Id. at 74 (2).

The legislature later amended OCGA § 17-10-6.2 (b), effective July 1, 2017, to provide that in the case of consecutive sentences for multiple sexual offenses, "the requirement that the court impose a probated sentence of at least one year shall only apply to the final consecutive sentence imposed." Despite this amendment, however,

9

the trial court was obligated to sentence Jones "pursuant to the statute in effect at the time he committed his crime." *Martinez-Chavez v. State*, 352 Ga. App. 142, 143 (1) (834 SE2d 139) (2019). See also *Widner v. State*, 280 Ga. 675, 677 (2) (631 SE2d 675) (2006) ("[I]t has long been the law in this State that, in general, a crime is to be construed and punished according to the provisions of the law existing at the time of its commission.") (citation and punctuation omitted); *Richardson v. State*, 334 Ga. App. 344, 347 (1) (779 SE2d 406) (2015) (OCGA § 17-10-6.2 did not apply in resentencing defendant convicted before the statute went into effect). Therefore, under *Riggs*, each of Jones' sodomy convictions requires imposition of a split sentence.

Accordingly, we vacate the sentences for Jones' sodomy convictions under Counts 1, 2 and 5, and we remand the case for resentencing in accordance with this opinion.

b. *Aggravated sodomy*. The jury convicted Jones of two counts of aggravated sodomy as charged on the counts involving O. Y. and J. H. . "[T]he only distinction between the [crimes of sodomy and aggravated sodomy involving an adult victim] is the element of force." *Melton*, 282 Ga. App. at 693 (2) (c); OCGA § 16-6-2 (a) (2) ("A person commits the offense of aggravated sodomy when he or she commits

10

sodomy with force and against the will of the other person[.]") Therefore, the "essential elements of aggravated sodomy are an act of illegal sodomy that is accompanied by force." *Melton*, 282 Ga. App. at 692 (2) (c). Our courts have interpreted the latter element as requiring evidence of actual force; constructive force based only on the victim's lack of capacity to consent is insufficient to support an aggravated sodomy conviction. *Brewer v. State*, 271 Ga. 605 (523 SE2d 18) (1999) (holding prior to 2000 amendment to OCGA § 16-6-2 (a) (2) – providing that an act of sodomy performed on a child under 10 constitutes aggravated sodomy – that proof of actual force required to establish crime of aggravated sodomy involving any child victim); *Melton*, 282 Ga. App. at 692 (2) (c) (proof of actual force required to establish crime of aggravated sodomy involving a mentally incapacitated adult).

J. H. and O. Y. each testified that Jones performed a nonconsensual act of sodomy upon him as alleged in the indictment, and that testimony along with other evidence at trial was sufficient to establish the illegal act of sodomy. Jones argues, however, that the State failed to prove the element of actual force required to establish aggravated sodomy. The indictment alleged that the act of sodomy was committed by force and against the will of the victim by "providing [him] with a substance which impaired his ability to comprehend and understand the nature of his

11

conduct[,]" and Jones argues that evidence supporting that allegation would only show constructive force based on the victim's lack of capability to consent.

We recently decided this issue against Jones' position in *Handley v. State*, 352 Ga. App. 106 (834 SE2d 114) (2019). There, we found that the State had established the requisite element of force based on the defendant's action in providing the victim a drug and alcohol, rendering him unable to resist the defendant's sexual assault. The evidence at Jones' trial also supports a finding that

> [Jones] did not merely perform acts of sodomy upon a victim who was incapable of consenting [as in *Brewer* and *Melton*]. Instead, he took affirmative action against [his victims, O. Y. and J. H.], supplying [them] with a drug and alcohol that rendered [them] incapable of consenting and overcame [their] ability to resist. [Jones'] actions had the same effect as other types of actual force recognized in Georgia[.]

*Handley*, 352 Ga. App. at 109.

Both O. Y. and J. H. testified to feeling "dizzy," "woozy," and generally out of it after consuming drinks provided by Jones. J. H. further testified that when he awoke with Jones on top of him, he was unable to move his body to resist Jones' sexual acts. Later testing showed that O. Y.'s urine contained tramadol, the consumption of which, along with alcohol, can lead to sedation and blackouts. This

12

and other evidence at trial was sufficient to support a jury finding that Jones had drugged both O. Y. and J. H. to overcome their ability to resist his sexual acts and thus was sufficient to show actual force. Accordingly, we affirm Jones' aggravated sodomy convictions.

c. *Sexual Battery*. Jones was charged with sexual battery with regard to J. H., W. W., and O. Y. by intentionally making physical contact with each of the victim's intimate parts, i. e., touching the victim's penis, without his consent.

(i) "The plain language of [the sexual battery statute] prescribes three elements that are required to establish the offense of sexual battery: (1) physical contact with the victim's intimate body parts; (2) intent to have such contact; and (3) lack of consent on the part of the victim." *Watson v. State*, 297 Ga. 718, 719 (2) (777 SE2d 677) (2015); OCGA § 16-6-22.1 (b). J. H., W. W., and O. Y. each testified that Jones had physical contact with his penis without his consent, and the evidence supported a finding that Jones acted with intent in doing so. This and other evidence at trial was sufficient to affirm his convictions for sexual battery.

(ii) Nevertheless, we find that the sexual battery conviction involving W. W. under Count 6 merged for sentencing with the sodomy conviction under Count 5 involving the same victim. Likewise, the sexual battery convictions under Counts 4

13

and 8, involving J. H. and O. Y., respectively, merged for sentencing with the aggravated sodomy convictions under Counts 3 and 7, involving J. H. and O. Y., respectively.

> [U]nder Georgia law, see OCGA § 16-1-7 (a), a defendant may not be legally convicted of a crime that is included as a matter of law or fact in another crime for which the defendant also stands convicted. A conviction that merges with another conviction is void – [a] nullity – and a sentence imposed on such a void conviction is illegal and will be vacated if noticed by this Court, even if no merger claim was raised in the trial court and even if the defendant does not enumerate the error on appeal.

*Nazario v. State*, 293 Ga. 480, 480 (746 SE2d 109) (2013). See also *Dixon v. State*, 302 Ga. 691, 697 (4) (808 SE2d 696) (2017) (Where "a merger error is so clear and obvious that it comes to our attention even without the help of any party," appellate courts "have the discretion to correct the error upon [its] own initiative[.]").

The counts charging sexual battery each allege that Jones touched the victim's penis, and the counts charging (aggravated) sodomy allege sexual conduct involving Jones' mouth and each victim's penis. Therefore, the counts charging these crimes are based on the same act: contact with the victim's penis. In determining whether merger is required "where the same act or transaction constitutes a violation of two

distinct statutory provisions," we apply the "required evidence" test set out in *Drinkard v. Walker*, 281 Ga. 211, 217 (636 SE2d 530) (2006). See also *Scott v. State*, 306 Ga. 507, 509 (2) (832 SE2d 426) (2019). Under that test, we must determine "whether each provision requires proof of a fact which the other does not." (Citation and punctuation omitted.) *Drinkard*, 281 Ga. at 215. See also *Johnson v. Williams*, 304 Ga. 771, 772 (822 SE2d 264) (2018). If so, the crimes do not merge.

The crimes of sodomy and aggravated sodomy require proof of facts that the crime of sexual battery does not in that they each require proof that the contact occur between the sex organs of one person and the mouth or anus of another. Sexual battery, on the other hand, does not require that physical contact with a person's intimate parts be made with any specific body part. Additionally, the crime of aggravated sodomy requires proof of force, which the crime of sexual battery does not.

However, as charged in this case, the crime of sexual battery does not require proof of any fact that the crimes of sodomy and aggravated sodomy do not. Sexual battery requires the State to prove intentional physical contact with the intimate parts of another person without his or her consent, and "intimate parts" includes "the primary genital area." See OCGA § 16-6-22.1 (a) & (b). Sodomy and aggravated

sodomy likewise require proof of contact between the sex organs of one person and, as charged here, the mouth of another. Thus, it is clear that in this case, the crime of sexual battery does not require proof of any fact that the crimes of sodomy or aggravated sodomy do not.

Accordingly, because the charges of sexual battery involving O. Y., K. J., and W. W. should have been merged for sentencing, we vacate Jones' sentence as to Counts 4, 6, and 8 of the indictment and remand for resentencing. Cf., e. g., *Parfenuk v. State*, 338 Ga. App. 95, 101 (3) 789 SE2d 332, 336 (2016) ("[C]hild molestation [involving fondling the primary genital area] was simply a greater offense into which the charge of sexual battery [for the same touching] was properly merged."); *Gunn v. State*, 300 Ga. App. 229, 230 (2) (684 SE2d 380) (2009) (convictions for sexual battery by touching child victim's genital area merged with convictions for child molestation by touching victim's vagina).

d. *Battery*. Jones was charged with one count of battery in that he caused visible bodily harm to the face and body of O. Y. by striking him with his fists. See OCGA § 16-5-23.1 (a) ("A person commits the offense of battery when he or she intentionally causes substantial physical harm or visible bodily harm to another."). O. Y.'s testimony that Jones had punched him in the nose and repeatedly struck him,

16

along with physical evidence of blood and other injuries to O. Y.'s body, provided sufficient evidence to support Jones' battery conviction beyond a reasonable doubt.

2. Jones next asserts that the trial court erred by failing to exercise its discretion in considering the general grounds and instead relied only on the sufficiency of the evidence standard in denying the motion for new trial. Jones is correct that

> [w]hen faced with a motion for new trial based on these general grounds, the trial court has the duty to exercise its discretion and weigh the evidence. The trial court does not exercise its discretion when it evaluates the general grounds by applying the standard of *Jackson v. Virginia*, supra, to a motion for new trial based on the general grounds embodied in OCGA §§ 5-5-20 and 5-5-21.

(Citation and punctuation omitted.) *Gomillion v. State*, 296 Ga. 678, 680 (2) (769 SE2d 914) (2015). However, it is apparent from the face of the order denying the motion for new trial that the trial court considered and applied the proper standard in considering Jones' motion on the general grounds. The order states:

> In the exercise of its discretion, the Court does not find that the jury's verdict was contrary to the evidence and the principles of justice, OCGA § 5-5-20, or was decidedly and strongly against the weight of the evidence so as to warrant the grant of a new trial, § 5-5-21; and the Court does not find that material evidence was admitted or withheld from the jury over objection so as to warrant a new trial, § 5-5-22. The

17

Court declines to exercise it authority as "thirteenth" juror to grant a new trial.

We find no error.

3. Jones further asserts that the trial court erred in allowing a service dog to accompany O. Y. while he testified because the dog's presence generated sympathy in the jury, which prejudiced his defense.

During the trial, the prosecutor expressed concern that O. Y. would not be able to testify without his service dog and asked the trial court to allow O. Y. to have the dog with him on the stand. The trial court heard testimony on the issue from O. Y.'s mother, who stated that her son had been diagnosed with post-traumatic stress disorder ("PTSD") following the assault by Jones and that he had medically withdrawn from UGA on that basis. She said that O. Y. was "extremely anxious, depressed, [with] fits of rage and irritability." O. Y. had undergone counseling, but he resisted taking medication to treat the disorder because he was drunk when the assault occurred, and he did not want to be incapacitated again. In lieu of an in-treatment program, O. Y.'s family had opted to pay a "tremendous amount of money for a service dog." The dog, which was four-and-one-half to five-months old, had gone through training to assist O. Y. with his PTSD and had been licensed and

registered. She said that although the dog was still a puppy, it had "an uncanny ability to disarm [O. Y.'s] symptoms[.]" The mother said that the dog went with O. Y. wherever he goes, including during a recent hospitalization, where the dog stayed in the bed with him. Further, when O. Y. was at his job as a chef, the dog remained accessible to him. Following this testimony, Jones' counsel objected to the dog's presence in court, which objection was overruled. Defense counsel then agreed to a procedure whereby the trial judge informed the jury that O. Y. was accompanied by a service animal without further statement or limiting instruction.

The record reflects that O. Y. and the dog entered and took their position on the witness stand before the jury was brought into the courtroom. They exited the courtroom after the jury was removed. The transcript also reflects that on four occasions, the dog's repositioning itself was audible, and on one occasion, it emitted a sound. However, the order clarified that the dog never left the area at O. Y.'s feet "in the partially enclosed witness stand and remained obscured except to a few jurors seated at the end of the jury box."

The use of service animals for witnesses with mental, psychological, or emotional conditions appears to be a matter of first impression in Georgia, but we

19

start with the proposition that a trial court has the responsibility under OCGA § 24-6-611 (a)

> [to] exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) Make the interrogation and presentation effective for the ascertainment of the truth; (2) Avoid needless consumption of time; and (3) Protect witnesses from harassment or undue embarrassment.

"The discharge of [this responsibility] necessarily entails the exercise of discretion." *United States v. Hill*, 643 F.3d 807, 845 (IV) (a) (11th Cir. 2011).[7] Georgia has long recognized that "a trial court is vested with considerable discretion in its conduct of court proceedings. This considerable discretion includes discretion to make reasonable accommodations for the comfort and care of witnesses with special needs." (Citations and punctuation omitted.) *Ezebuiro v. State*, 308 Ga. App. 282, 284 (1) (707 SE2d 182) (2011). See also *Lonergan v. State*, 281 Ga. 637, 640 (4) (641 SE2d 792) (2007) ("The trial court is vested with considerable discretion in its conduct of court proceedings."). Although Georgia courts have not addressed this

---

[7] Because OCGA § 24-6-611 (a) closely tracks the federal rule, we reference federal precedent in interpreting this provision. See *Olds v. State*, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016); Ronald L. Carlson and Michael Scott Carlson, *Carlson on Evidence*, p. 311 (5th Ed. 2016).

issue, other states have held that it is in within a trial court's discretion to permit a witness to use a service animal. See, e. g., *Smith v. State*, 491 SW3d 864, 877 (III) (Tex. App. 2016) (decision of whether to allow service animal to accompany witness fell within trial court's discretion); *State v. Dye*, 178 Wash2d 541, 557 (III) (309 P3d 1192) (2013) (same); *People v. Tohom*, 109 AD3d 253, 267 (969 NYS2d 123) (2013) ("judge conducting a public trial is empowered to control the proceedings in whatever manner may be consistent with the demands of decorum and due process").

Here, the trial court investigated the matter outside the jury's presence and took evidence on the witness's condition, the need for the service animal, and the service animal's training. The court also consulted with counsel to employ procedures designed to minimize the dog's presence and visibility to the jury. Under these circumstances, we find that the trial court acted within its discretion in allowing O. Y.'s dog to accompany him during his testimony. See *Ezebuiro*, 308 Ga. App. at 284 (1) (no abuse of discretion where trial court allowed prosecution to present rebuttal testimony from witness seated on a hospital gurney); *Williamson v. State*, 234 Ga. App. 658, 658-59 (2) (507 SE2d 765) (1998) (trial court did not abuse its discretion by allowing grandmother to stand near nine-year-old child molestation victim during his testimony).

Moreover, Jones has failed to show that he was harmed by the trial court's decision. Given the procedures the trial court followed to minimize the dog's presence, we cannot assume that the dog had any impact on the jurors, much less that it engendered sympathy in them for O. Y.[8] Although Jones points to statements made by an alternate juror who was excused from service after she realized that she had previously interacted with O. Y. and was sympathetic toward him, her impressions were formed before trial and were not based on the dog's presence in the courtroom.[9]

Accordingly, we find that Jones' argument on this ground is without merit.

4. Jones also contends that the trial court created structural error when the State's victim's advocate prevented members of the public from entering the courtroom during C. B.'s testimony.

During C. B.'s testimony, Jones' attorney informed the trial court that some people had been excluded from the courtroom, and the trial court conducted an

---

[8] Jones assumes that the dog generated sympathy without any evidence in support and contrary to the fact that some people fear or dislike animals.

[9] The juror said she had spoken with O. Y. on several occasions when he, accompanied by his dog, came into the store where she was working. The juror's observations of O. Y.'s behavior in the store and his statement to her that he had a learning disability led the juror to conclude that O. Y. was ill, which caused her to be sympathetic towards him.

into the matter. The record reflects that three interns from the public defender's office had entered the courtroom during C. B.'s testimony when a victim's advocate employed by the district attorney's office tapped them on the shoulder and asked them to step outside, which they apparently did. The advocate told the interns that C. B. had expressed concern about having too many people in the courtroom while he testified. When one of the interns asked whether it was an open courtroom, the advocate agreed that it was and told them that it was their choice whether to go back into the courtroom. The interns later chose to return to the courtroom. After questioning the advocate, the trial court admonished her that it is inappropriate to restrict access to the courtroom without first bringing the issue up before the trial court and counsel.

We start our analysis with the well-established principle that "[t]he improper closure of a courtroom is a structural error that must be remedied even without any showing of direct harm. [Cit.]" *Jackson v. State*, 339 Ga. App. 313, 319 (2) (b) (793 SE2d 201) (2016). See also *Reid v. State*, 286 Ga. 484, 488 (3) (c) (690 SE2d 177) (2010). Here, however, the courtroom was never closed to anyone; rather, three interns exited the courtroom voluntarily at the advocate's request. In speaking with

the interns, the advocate acknowledged that it was an open courtroom and that they could re-enter it at will, which they did. Under these circumstances, we find that the courtroom was not improperly closed and thus no constitutional violation occurred.

5. Jones further argues that the trial court erred in allowing the prosecution to present evidence of two extrinsic acts.

> On appeal, a trial court's decision to admit evidence pursuant to OCGA § 24-4-404 (b) is reviewed for a clear abuse of discretion, a review requiring the appellate court to make a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness.

(Citations omitted.) *Parks v. State*, 300 Ga. 303, 305-306 (2) (794 SE2d 623) (2016).

The State presented the testimony of M. G. and J. C., who described incidents, in which they drank alcohol provided by Jones, then felt "disoriented" and "fuzzy," respectively, and later woke up in Jones's bed, in the case of M. G., to find himself partially unclothed and, in the case of J. C., to find Jones performing oral sex on him. These incidents occurred in 2014, during the same time period as the crimes charged in this case. The trial court gave a limiting instruction before M. G. and his parents testified and gave another limiting instruction before J. C. gave his testimony. Those

24

instructions limited the jury's consideration of this evidence to the issue of whether the State had established intent, plan, preparation, and opportunity, "and not for any other purpose."

Jones first asserts it was error to introduce the evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") to show opportunity because he never disputed that he had the opportunity to be with the victims. However, this Court previously has accepted a definition of "opportunity" in this context that includes not only "evidence tending to establish opportunity, in the sense of access to or presence at the scene of the crime[,]" but also "in the sense of possessing distinctive or unusual skills or abilities employed in the commission of the crime charged." (Citation and punctuation omitted.) *Sloan v. State*, 351 Ga. App. 199, 207 (830 SE2d 571) (2019). Although Jones did not dispute knowing or being with the victims in this case, he disputed the State's allegations that he laced the victims' drinks with a drug to overcome their resistance to his sexual advances. Thus, the jury was required to consider whether Jones had the ability to introduce a substance into a victim's drink that was capable of incapacitating him without being detected. The other acts evidence was relevant to show that Jones possessed such a distinctive ability. M. G. testified that after sipping a drink Jones handed him, he did not remember anything until he woke up in

Jones' bed. The next morning, he did not have the usual feelings of a hangover; instead, he felt "completely disoriented" like he had been hit by a tornado. J. C. testified that after drinking with Jones, he felt "fuzzy" and got "a weird sensation[,]" before "everything went black." Thus, the evidence was properly admitted to show opportunity. In any event, Jones does not dispute that the evidence was otherwise admissible to show intent, plan, or preparation. Compare *Brown v. State*, 303 Ga. 158 (2) (810 SE2d 145) (2018) (error to admit other acts evidence where none of the purposes for which it was admitted was an issue in the case).

Jones also asserts that the admission of such evidence was unnecessary because each victim's testimony served as extrinsic act evidence for the other victims, and thus he appears to be arguing that the admission of the evidence was unduly prejudicial as prohibited under OCGA § 24-4-403 ("Rule 403").[10] The analysis under this statute "must be done on a case-by-case basis and requires a common sense assessment of all the circumstances surrounding the extrinsic act and the charged offense." (Citation and punctuation omitted.) *Castillo-Velasquez v. State*, 305 Ga.

---

[10] "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403.

26

644, 648 (2), 827 SE2d 257 (2019). "Rule 404 (b) is a rule of inclusion and Rule 403 is an extraordinary exception to that inclusivity[.]" (Citation and punctuation omitted.) *West v. State*, 305 Ga. 467, 474 (2) (826 SE2d 64) (2019). Therefore, "in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) *Strother v. State*, 305 Ga. 838, 847 (4) (d) (828 SE2d 327) (2019). The probative value of evidence arises (1) "in large part from the extent to which the evidence tends to make the existence of a fact more or less probable[;]" (2) from "the marginal worth of the evidence – how much it adds, in other words, to the other proof available to establish the fact for which it is offered[;]" and (3) from "the need for the evidence." *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016).

Here, Jones' defense was to attack the credibility of the five named victims and to assert that his sexual encounters with them resulted after the victims, who were friends and acquaintances, drank too much alcohol, returned to his apartment, and engaged in consensual, drunken sex. The State was entitled to present evidence to counter that defense and to corroborate the victims' testimony. M. G. testified that his friends and he were leaving a bar to go to an agreed-upon location to meet his mother

27

for a ride home. He was texting with his mother about these plans when Jones handed him a drink from which he took a couple of sips and then remembered nothing until he woke up in Jones' bed. After M. G. awoke, he found his phone and dropped a pin so that his parents, who had been searching for him all night, could find him. J. C. testified that he developed a weird sensation and blacked out after drinking with Jones and that he attempted to resist Jones sexual advances when he woke up but blacked out again.

This evidence is probative of Jones' intent to ply the victims with alcohol that was laced with other substances so that he could take advantage of them when they were unable to resist and of the victims' lack of consent. Under these circumstances, we cannot say that the trial court clearly abused its discretion in determining that the probative value of this evidence was not outweighed by any undue prejudice.[11]

---

[11] We note that M. G. testified after four of the victims presented their testimony and J. C. testified after all five of the victims had testified, thus distinguishing this case from *Gilstrap v. State*, 261 Ga. 798, 799 (2) (410 SE2d 423) (1991). In that case, the Supreme Court found that the trial court erred in allowing the State to present evidence of nine similar transactions before introducing any evidence about the charges on trial, which could have prejudiced the jury to find the defendant guilty before any evidence of the indicted offense was presented.

6. Jones further asserts that he received ineffective assistance of counsel in failing to cross-examine O. Y. on an inconsistent statement O. Y. made about whether he had planned to spend the night with Jones on the night the crimes were committed.

"To establish his claim of ineffective assistance of counsel, [Jones] must show both that his attorney's performance was deficient and that he was prejudiced as a result of his counsel's performance." *Sarat-Vasquez v. State*, 350 Ga. App. 322, 326 (2) (829 SE2d 394) (2019). See also *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). In order to show deficient performance, Jones must show that his trial counsel "acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms." (Citation and punctuation omitted.) *Haney v. State*, 305 Ga. 785, 790 (2) (827 SE2d 843) (2019). To establish prejudice, Jones must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). "This burden is a heavy one." *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). "A defendant's failure to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to

29

examine the other prong." (Citation and punctuation omitted.) *Sarat-Vasquez*, 350 Ga. App. at 326 (2).

At the hearing on the motion for new trial, trial counsel testified that he had been a member of the Georgia bar since July 2000, and he had experience as an assistant district attorney and in private practice before joining the public defender's office in June 2005. In that time, he had tried over 60 felony cases, approximately one-third of which were sex crimes.

Pretermitting whether trial counsel was deficient in failing to impeach O. Y.'s testimony as argued by Jones, we find that Jones failed to show that he was prejudiced by this omission. Evidence of the alleged discrepancy between O. Y.'s testimony that he did not have plans to "hang out" with Jones and his prior statements was admitted through the testimony of the police sergeant who responded to O. Y.'s report of the crime. The sergeant testified on direct that O. Y. told him that he had made arrangements to stay at Jones' house that night. On cross-examination, trial counsel elicited testimony that O. Y. told police he had planned to go to Jones' apartment and was planning to spend the night there. Because any such evidence elicited to impeach O. Y. on his testimony would have been merely cumulative of the sergeant's testimony, we find that Jones has failed to show that he was prejudiced by

any deficient performance by trial counsel. See, e.g., *Henry v. State*, __ Ga. __ (2) (b) (835 SE2d 602) (2019) (in light of other evidence elicited on cross-examination, defendant failed to demonstrate a reasonable probability that impeachment would have resulted in a different outcome at trial); *Cochran v. State*, 305 Ga. 827, 831 (2) (a) (828 SE2d 338) (2019) (finding that trial counsel's failure to present cumulative evidence through additional testimony did not amount to ineffective assistance); *Wesley v. State*, 286 Ga. 355, 358 (3) (h) (689 SE2d 280) (2010) (same).

Accordingly, we find that Jones failed to establish his claim of ineffective assistance of trial counsel.

*Judgment affirmed, sentence vacated in part, and case remanded. McFadden, C. J., and Senior Appellate Judge Herbert E. Phipps concur.*